**In re KENTUCKIANA TRUCK & TRAILER REPAIR, INC., Debtor.**

**Ronald J. Ralph, Alice A. McKinley, Plaintiffs,**

**v.**

**Stock Yards Bank and Trust Company, Defendant.**

**Bankruptcy No. 01–31038(1)(7). Adversary No. 01–3079.**

United States Bankruptcy Court, W.D. Kentucky.

July 15, 2002.

---

"Ralph/McKinley") against the Defendant, Stock Yards Bank and Trust Company ("SYB"). Ralph/McKinley claim that their security interest is superior to the lien of SYB on the assets of Kentuckiana Trust & Trailer Repair, Inc. ("KTTR"), that SYB converted the proceeds of the KTTR collateral upon which they hold a superior lien, that SYB committed acts which entitle them to affirmative relief against SYB under the principles of equitable subordination, "alter ego", equitable marshaling and for interference with business contract. For the reasons set forth below in detail, the Court dismisses all of Ralph/McKinley's claims against SYB, with prejudice.

## FINDINGS OF FACT

KTTR, a Kentucky corporation, began operations in April 1991, providing road service, complete repairs, engine rebuilds, transmission service and body work for tractors and trailers. *See* DX 27, page 8. Joseph Lee Fleig ("Mr. Fleig") was a shareholder, officer and director of KTTR from 1991 to the end of its operation in April 2001. While Mr. Fleig is not a party to the instant proceeding, he figures prominently in this action.

During the summer of 1994, Ralph/McKinley purchased 51% of KTTR, leaving 49% for Mr. Fleig and his wife. Mr. Ralph is a businessman with many years of experience. Mrs. McKinley has a business degree and some business experience. Upon purchase of the KTTR stock, Mr. Ralph became the Chairman/Treasurer of KTTR and Mr. Fleig acted as the President/Secretary. Mrs. Fleig did not work at KTTR, but Mrs. McKinley worked at KTTR from August through mid-December 2000.

After Ralph/McKinley purchased the KTTR stock, Mr. Ralph decided to change

Wallace Hugh Spalding, III, Louisville, KY, for debtor.

Jay S. Geller, Portland, ME, Neil Charles Bordy, F. Larkin Fore, Louisville, KY, for plaintiff.

John A. Majors, Louisville, KY, for defendant.

William S. Reisz, Louisville, KY, trustee.

Joseph J. Golden, Office of the U.S. Trustee, Louisville, KY, U.S. Trustee.

## MEMORANDUM–OPINION

JOAN L. COOPER, Bankruptcy Judge.

## INTRODUCTION

This matter is before the Court after conclusion of a trial on the merits of the claims asserted by the Plaintiffs, Ronald J. Ralph ("Mr. Ralph") and Alice A. McKinley ("Mrs. McKinley"), husband and wife (hereafter collectively referred to as

KTTR's banking relationship from Liberty National Bank to SYB. On December 16, 1994, KTTR, including Mr. Ralph and Mr. Fleig personally, and SYB entered into a Letter Agreement regarding a Line of Credit to be made available to KTTR. *See* DX 2. The Letter Agreement provided, among other things, that SYB would make loans or advances to KTTR up to $500,000 for working capital and that the Line of Credit would be secured by a first security interest in substantially all of KTTR's assets, which included accounts receivable, machinery, equipment, fixtures, general intangibles and inventory. The Letter Agreement further provided that all loans owed by KTTR to SYB would be collateralized so that the assets securing one loan would also secure the others and that a default by KTTR on any of its obligations to SYB would act as a default under all of its obligations to SYB.

In addition to the Letter Agreement, Mr. Ralph, as Chairman of KTTR, executed a Note on KTTR's behalf payable to SYB in the amount of $500,000 dated December 23, 1994. *See* DX 9. Mr. Ralph and Mr. Fleig also signed the Note as guarantors. At the same time, KTTR, through Mr. Ralph, executed a Security Agreement which granted SYB a lien to secure

> [a]ll Debt(s), which included each and every debt, liability and obligation of every type and description (whether such debt, liability or obligation now exists or is incurred or created in the future and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several).

*See* DX 1. SYB filed a UCC–1 Financing Statement with the Office of the Clerk of Jefferson County on January 9, 1995, which was later continued by the filing of a UCC–3 Continuation Statement filed in the same office on December 22, 1999. *See* DX 1.[1]

Later, in 1996, KTTR determined that it needed a $50,000 loan from SYB to purchase tire inventory at a discount. Mr. Ralph again signed the Note dated July 24, 1996 on KTTR's behalf and both Mr. Ralph and Mr. Fleig signed as guarantors. The Note provides that it was secured by the previously pledged assets of KTTR and the personal guarantees of Mr. Ralph and Mr. Fleig. While no separate Security Agreement was executed, the Letter Agreement introduced as PX 17 indicates the Note was to be collateralized by the same assets listed in the 1994 Security Agreement (PX 11) and contains the same cross collateralization and cross default language as the Letter Agreement dated December 14, 1994 (PX 8).

In the meantime, Mr. Ralph ran the financial and management operations of KTTR, while Mr. Fleig ran the shop due to his talent as a mechanic. On as many as two occasions, KTTR needed funds and instead of borrowing funds from SYB, Mr. Ralph injected personal funds as capital into the business. While with KTTR, Mr. Ralph testified that KTTR made all payments due SYB on time. Mr. Ralph testified that KTTR could meet all of its capital needs without further borrowing.

Notwithstanding this apparent congenial and profitable business environment, Mr. Fleig's performance at KTTR during Mr. Ralph's involvement (as well as later) was marked by Mr. Fleig's determination to

---

**1.** Plaintiff introduced 149 Exhibits and Defendant introduced 27 Exhibits, all of which were eventually admitted into the record. The Court will not refer to each and every Exhibit evidencing or involving a certain transaction or transactions unless that Exhibit has particular evidentiary value.

get his way on KTTR's business development. Mr. Ralph, and Mrs. McKinley to some extent, testified that if Mr. Fleig did not get things his way or did not like the way things were going, he would miss work, threaten to take his life (and had to be rescued from self-inflicted asphyxiation once) or even, on one occasion, pointed a pistol with a laser site upon Mr. Ralph's chest. Neither Mr. Ralph nor Mrs. McKinley ever told SYB about Mr. Fleig's self-destructive or potentially violent disposition.

During the summer of 1997, Mr. Ralph began discussions with Mr. Fleig regarding a buyout of his stock interest in KTTR. Over the course of several months they agreed to a Stock Purchase Agreement dated December 31, 1997. Under the Stock Purchase Agreement, which was prepared by Mr. Ralph's counsel, KTTR bought the Ralph/McKinley shares for $400,000, payable $100,000 in cash, with a Note for the balance, secured by a lien on substantially all of KTTR's assets. *See* PX 27. The loans Ralph/McKinley had made to KTTR were rolled into a Note in the amount of $75,377.50 dated December 31, 1997, which was not secured by KTTR's assets. *See* PX 27–32. To secure payment of the $300,000 Note, Ralph/McKinley filed a UCC–1 financing statement in the Office of the Clerk of Jefferson County on January 5, 1998. *See* PX 31 and 35. SYB was aware that Ralph/McKinley were in the process of selling their interest and was aware of the terms of the Stock Purchase Agreement shortly after its execution.

After Mr. Ralph left KTTR to pursue other interests, including a job with D.D. Williamson managing three manufacturing facilities both in the United States and abroad, Mr. Fleig dramatically expanded KTTR. Mr. Ralph testified that he and Mr. Fleig had discussed these expansion plans before he left and that Mr. Ralph had strongly disagreed with and advised against Mr. Fleig's plans. The KTTR expansion was largely if not entirely financed by SYB with as many as 17 loans from October of 1997 to May of 2000. *See* PX 112, 113, 115, 118, 120, 122, 123, 128, 129, 131, 133, 134, 136, 138, 143, 144 and 149. These loans were used to purchase a business property next door, one in Southern Indiana, one in Lexington, Kentucky, for inventory and to finance working capital for KTTR. SYB testified that from December 1994 to the date of KTTR's bankruptcy, KTTR always owed SYB under a loan or loans.

Mr. Ralph testified that between December 1997 when he sold his interest in KTTR and December 1998, he regularly provided Mr. Fleig with business advice. Nevertheless, Mr. Ralph was mainly concerned about getting paid on his Note. He, again, became interested in KTTR's performance when he received a copy of a late payment notice from SYB to KTTR dated October 22, 1998. *See* PX 36. At this point, Mr. Ralph asked Mr. Fleig to gain a release for him from his guarantees of KTTR debt. Within a month, SYB released Mr. Ralph even though Mr. Ralph's financial condition had always been one of KTTR's strengths from SYB's viewpoint.

From the time of Mr. Ralph's release from the guarantees through January 2000, Ralph/McKinley continued to receive regular payments on the Notes and again lost interest in KTTR's affairs. Their interest was rekindled in early 2000 when Mr. Fleig asked Ralph/McKinley for a six month deferral of interest payments on the Notes. Mr. Ralph testified that Mr. Fleig admitted to him that he had over-expanded the business and needed Mr. Ralph's business advice. Mr. Ralph made some recommendations to Mr. Fleig but since Mr. Fleig had pursued his grandiose ex-

pansion, Mr. Ralph was left to mainly recommend the employment of a financial person to assist in the office operations of KTTR. While KTTR continued through its closing to use Stuedle, Spears & Company, PSC, an accounting firm selected by Mr. Ralph while he ran KTTR's finances, KTTR needed someone at work everyday to help Mr. Fleig.

Mr. Ralph recommended Cary Rothbauer, a retired financial analyst. Mr Rothbauer worked for KTTR for a time preparing financial data that Mr. Fleig apparently did not understand. Later, Mr. Ralph met with Mr. Fleig and Mr. Rothbauer and followed up on this meeting by privately asking Mr. Rothbauer about KTTR's progress. *See* Deposition of Ronald J. Ralph, page 34 and 35. Mr. Ralph testified that Mr. Rothbauer believed Mr. Fleig was not financially smart and that KTTR was not doing well.

In June of 2000, Mr. Ralph learned from Mr. Fleig and Mr. Rothbauer that KTTR needed a restructuring of the SYB debt. Mr. Ralph attended KTTR's meeting with SYB representatives regarding KTTR's proposal for restructuring the outstanding debt. On June 15, 2000, SYB, KTTR and the Fleigs as guarantors entered into a Lending Agreement. *See* DX 13. The Lending Agreement provided, among other things, that the pre-existing unpaid loans were paid off with the proceeds of and/or rolled into five notes, KTTR received additional working capital and KTTR agreed to additional timely financial information and a reaffirmation of KTTR's pledge of collateral to SYB as security for repayment of the outstanding notes.

SYB had its counsel prepare a Standby and Subordination Agreement for Ralph/McKinley to sign. *See* PX 55. SYB testified that even though it did not believe it needed Ralph/McKinley's subordination, it requested it as a "belt and suspenders"

precaution. Ralph/McKinley refused to sign the Standby and Subordination Agreement, but executed a Standby Agreement which provided that Ralph/McKinley would receive interest only payments for 18 months and that nothing about the agreement would affect the existing priority of the liens on the collateral. *See* PX 73. By July of 2000, KTTR resumed making interest payments to Ralph/McKinley and continued to do so until early 2001.

By November 2000, KTTR was again in trouble. In addition to $87,356.95 in overdrafts in the checking account, KTTR needed additional working capital. SYB made its last loan of $175,000 to KTTR secured by KTTR stock, various vehicles and the collateral pledged on the existing five notes executed as part of the June 2000 restructuring. *See* PX 76–81.

After the June 2000 restructuring Mr. Ralph was busy with his management responsibilities at D.D. Williamson. At some point Cary Rothbauer left KTTR and Mr. Fleig needed help with managing the business. Beginning in August 2000, Mr. Ralph and Mr. Fleig requested that Mrs. McKinley begin work at KTTR's eastern Louisville location to try and help Mr. Fleig. Mrs. McKinley discovered as soon as she began working at KTTR that Mr. Fleig was a bad manager and that KTTR had serious financial problems, including the failure to bill its customers on a timely basis for many months. Mrs. McKinley's tenure with KTTR ended in mid-December 2000 when she became convinced that Mr. Fleig had not been honest with KTTR's major customer (a fact which she never relayed to SYB).

About the time of Mrs. McKinley's departure, KTTR employed Ogden and Associates, Inc. ("Ogden") to assist KTTR in a turnaround. *See* PX 92. Ogden had originally been contacted by a workout attor-

ney who had met with KTTR about its problems. After a meeting with Mr. Fleig, Ogden agreed to get involved. At first, Ogden believed that a turnaround was possible with competent management, additional lending (or use of cash collateral) from SYB or Ralph/McKinley and its efforts to negotiate with KTTR's major customer(s). Ogden soon realized in late December 2000 that KTTR's major customer and the obligor on a receivable due KTTR in the approximate amount of $550,000, not only would not pay, but claimed overpayment. Further, Ogden learned that neither SYB nor Ralph/McKinley would lend KTTR any more funds. Ogden believed that without SYB's agreement to use its cash collateral, plus additional lending, KTTR could not have even financed the Liquidation Budget proposed by Ogden. *See* PX 94.

Nevertheless, Ogden combined the three existing business accounts into one and tried to put a lockbox arrangement in place so that KTTR's accounts receivable went to SYB to control disbursements in order to fund the reorganization of the company. Ogden testified that Mr. Fleig interfered with this process directly with the customers and the lockbox arrangement never worked. Ogden also restricted the check writing authority of KTTR, which involved requiring SYB to sign off on any checks thereby ensuring that SYB would approve of the expenditure of its cash collateral. Mr. Fleig attempted to get SYB to sign off on a check or checks made out to his wife. The account was closed within weeks after it was opened, without ever having had any substantial deposits. Ultimately, failing to see any hope in resurrecting KTTR, Ogden resigned on April 6, 2001.

What apparently none of the parties to this case knew, was that sometime in late 2000 or early 2001, Mr. Fleig had surreptitiously opened a new checking account at Republic Bank & Trust Company and was removing KTTR customer payments from the mail, depositing them in the new account and using the funds for business and personal expenditures. Ogden's onsite manager, James Head, testified that he would try to get the mail before Mr. Fleig and that if he did, he would make a deposit of the funds received. *See* DX 27, page 186. Cryptically, Mr. Head testified that if Mr. Fleig opened the mail first, Mr. Head would not see a deposit slip for that day.

In February 2001, KTTR defaulted on payment of the Ralph/McKinley notes, they were accelerated and when payment was not made, Ralph/McKinley joined with other creditors and filed an involuntary bankruptcy petition against KTTR. KTTR moved to convert the case to a Chapter 11 case and later after a motion was made to appoint a trustee, the case was converted to a Chapter 7 case. At a hearing before the Bankruptcy Court, everyone learned about the Republic Bank & Trust Company account from Mr. Fleig. Thereafter, a Trustee was appointed and took control of KTTR's records and assets, to the extent they still existed. At the time of the bankruptcy, SYB was owed approximately $1,350,000. SYB has received one disbursement from the Trustee relating to the proceeds of certain vehicles sold by the Trustee and upon which SYB held a lien. Ralph/McKinley are owed in excess of $415,000 and have received nothing since the last interest payment from KTTR in January 2001.

Insofar as Ogden's employment, both Ogden and SYB testified that SYB did not retain Ogden, SYB did not suggest Ogden's employment, approve or object to the employment, did not give Ogden instructions on KTTR matters and Ogden has never worked for SYB either before

this transaction or after to the date of trial. SYB testified that it was aware that if Ogden was to be paid, the funds would necessarily come from its collateral. Finally, during the summer of 2001, the Chapter 7 Trustee requested Mr. Head, Ogden's representative, to provide him copies of KTTR's accounts receivable aging. On July 31, 2001, Ogden invoiced SYB for fees in the amount of $233.65 incurred in gathering this information for the Chapter 7 Trustee, which SYB paid. *See* PX 89.

Ralph/McKinley introduced several exhibits demonstrating that Ogden attempted to keep SYB informed of most of his efforts. *See* PX 91, 94 and 99. The exhibits also demonstrate SYB's acceptance of these reports, with one response in the form of a search by SYB's attorneys regarding a Uniform Commercial Code search in Jefferson County. *See* PX 93, 96 and 101. SYB requested and received reports on the financial progress at KTTR, but Ralph/McKinley never asked for this same information. Ogden testified that to the extent one of his letters referenced SYB's dominion and control over its collateral, the choice of words was his and he intended to convey that SYB was monitoring the liquidation and intending collection of its collateral. *See* PX 104.

Ralph/McKinley introduced what appears to be the bulk of SYB's loan files which include loan documents, internal memoranda, loan committee notes, credit analyses of KTTR's operations, correspondence, agreements on file and evidence of the state of SYB's miscellaneous file organization. Most of these exhibits were introduced as evidence of SYB's knowledge of the subordination provision in the Stock Purchase Agreement which Ralph/McKinley claim supports their lien priority position, their claim of conversion and their claim to interference with contract. The

internal memoranda, loan committee notes and credit analyses of KTTR were introduced to demonstrate SYB's knowledge of the inadequacy of collateral to support KTTR's debt to SYB and over-lending which allegedly caused KTTR to ultimately breach the Stock Purchase Agreement. Ralph/McKinley also point to this evidence as the basis for their claims for recovery under the theories of equitable subordination, "alter ego" and equitable marshaling.

The Court reaches the conclusion from the totality of the evidence before it that KTTR's implosion and failure are the direct result of Mr. Fleig's mismanagement of KTTR and ultimate conversion of KTTR's assets. Mr. Ralph's testimony was particularly instructive when he described Mr. Fleig as the most talented truck mechanic he had ever witnessed but that his skills as a manager were poor. Indeed, this is one of the reasons the original investment in KTTR was attractive to Mr. Ralph since he was particularly well-suited to manage the finances and operations of KTTR and had Mr. Fleig's talent in the shop. Ralph/McKinley were aware of all of Mr. Fleig's inadequacies, except for Mr. Fleig's use of the Republic Bank checking account. Both Mr. Ralph and Mrs. McKinley testified they did not know the full extent of KTTR's borrowing from SYB until after the Trustee became involved. The Court does not find this testimony persuasive given the level of Mr. Ralph's involvement with Mr. Fleig, KTTR and their financial advisors from the beginning to end, and Mrs. McKinley's involvement from August 2000 until mid-December 2000.

The Court finds that Ralph/McKinley had ample information available to them to conclude that KTTR was on a downward spiral from at least January of 2000. This was because Mr. Ralph continued to talk to Mr. Fleig and KTTR employees, provid-

ed Mr. Fleig business advice, heard the stories of the burdens caused by Mr. Fleig's expansion of KTTR, met with SYB and KTTR and reviewed KTTR's financial statements prepared by Stuedle. Clearly, Ralph/McKinley were insiders to KTTR from the purchase of the stock until at least mid-December 2000. Mr. Ralph testified that even when he lost interest in KTTR, Mr. Fleig would call him from time to time to get his advice on KTTR matters. On the other hand, no credible evidence was introduced that tended to indicate that SYB was ever involved with KTTR other than at arm's length as a typical commercial lender or that SYB was ever an insider to KTTR.

### CONCLUSIONS OF LAW

■ The Court begins with Ralph/McKinley's perfection and conversion claims, as they are ultimately interrelated. Under the Kentucky Uniform Commercial Code (in effect at the time), absent a special priority,

> Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

*See* KRS 355.9–312(5)(a). Clearly, SYB filed its UCC–1 first and filed a timely UCC–3 continuation statement on December 22, 1999.

Upon attachment, SYB's security interest became perfected. *See* KRS 355.9–303 (the statute in effect at the time of perfection). Attachment occurred when KTTR signed the Security Agreement (PX 11), when SYB gave value to KTTR in the form of disbursement of the proceeds and KTTR had rights in the collateral (which it owned prior to the SYB loan). *See* KRS 355.9–203. None of these facts are disputed. Clearly, SYB's security interest became a perfected, first and prior lien on KTTR's assets at that point.

The Security Agreement (PX 11) clearly and unambiguously states that the security interest granted in December 1994 was intended to extend to "all debts" of "every type and description" of KTTR, including future obligations. Since SYB filed a UCC–1 financing statement and was perfected first on KTTR's assets, it maintained its priority as all of SYB's loans were made while SYB's lien was perfected. *See* KRS 355.9–312(7). SYB testified at trial that KTTR has owed SYB on a loan or loans for the entire time since the December 23, 1994 loan. SYB's UCC–1 has not lapsed, even today.

Ralph/McKinley claim that their UCC–1 filing on January 5, 1998 should have priority over SYB's lien, arguing that SYB's security interest in substantially all of KTTR's assets extended only to the loans Mr. Ralph secured while he was in charge of KTTR (the "Ralph/SYB Loans"), which were ultimately paid off in 1999, and did not extend to future advances. Ralph/McKinley argue that the loans made to KTTR without his knowledge (the "KTTR/SYB Loans") were (i) not contemplated by KTTR and SYB when the first UCC–1 was filed, (ii) were not of the same type or class as the Ralph/SYB Loans, (iii) were not future advances under the Uniform Commercial Code, and (iv) subordinate to Ralph/McKinley's lien, after payment of the $280,000 owed to SYB as of the date of the Stock Purchase Agreement.

While these issues ended up being tried, the Court determines that SYB's loan documents are not even latently ambiguous. The Security Agreement (PX 11) has no language whatsoever that could be construed as a limitation on future borrowing.

In fact, the loan documentation, which the Court reviewed in painstaking detail, taken as a whole clearly indicates that KTTR and SYB contemplated a long term lending relationship for any number of business purposes and for the previously pledged collateral to stand as security for other obligations of KTTR to SYB. It is also clear to the Court that the KTTR/SYB Loans were business loans for the purchase of inventory, working capital and the acquisition of real estate and are not so unlike the Ralph/SYB Loans as to be cast as a different type or class of loan.

Ralph/McKinley focus much on the subordination provision in the Stock Purchase Agreement as support for their position that once the Ralph/SYB Loans ($280,000 in December 1997) were paid, their lien would come ahead of SYB's. The Stock Purchase Agreement speaks for itself and it does not involve subordination of SYB's lien. Rather, it applies to Ralph/McKinley's agreement to subordinate their lien, upon request, to liens that may be required by KTTR's commercial lender. SYB was not a party to the Stock Purchase Agreement, did not sign it and was not bound by Ralph/McKinley's promise in the agreement. While SYB was aware of the terms of the Stock Purchase Agreement, that awareness has no consequence on the perfection of SYB's lien. SYB held a perfected, first priority security interest in substantially all of KTTR's assets when it filed its first UCC–1, which has not lapsed. SYB never needed and KTTR never asked Ralph/McKinley to subordinate. Ralph/McKinley's lien was subordinate before their lien was perfected.

 Ralph/McKinley claim that during Ogden's involvement in KTTR, Ogden acted as SYB's agent and assumed possession and control over Ralph/McKinley's collateral. First, Ralph/McKinley did not accelerate the note and demand payment until after Ogden had begun its work and therefore did not have an immediate right to possession of the collateral. Second, Ralph/McKinley did not hold a first lien on KTTR's assets and therefore, had no right to collection on KTTR's assets ahead of SYB. Finally, the Court finds the claim that Ogden acted as SYB's agent to be unpersuasive. The only probative evidence tending to show agency was SYB's payment of Ogden's July 2001 invoice. Even if Ogden was SYB's agent, the testimony was unequivocal that Ogden did not take possession of KTTR's assets. KTTR was still in control of its assets as of April 2001. SYB did not receive any payments from KTTR after December 2000, never received any proceeds of its collateral from Ogden and only recently received the proceeds from a few vehicles sold by the Chapter 7 Trustee. Therefore, SYB did not convert Ralph/McKinley's proceeds either through Ogden or directly. KTTR's collapse took all of its assets except for a few vehicles and some equipment.

The Court now turns to Ralph/McKinley's claims for equitable subordination, "alter ego" liability, equitable marshaling and tortious interference with contractual relations. The Bankruptcy Code includes a provision relating to the subordination of claims. Section 510(c) of Title 11 provides that after notice and a hearing, the court may

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

 The Sixth Circuit Court of Appeals has interpreted this section to re-

quire a showing that (a) the claimant must have engaged in some type of inequitable conduct, (b) the misconduct must have resulted in injury to creditors of KTTR or conferred an unfair advantage on SYB, and (c) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *In re Baker & Getty Fin. Serv. Inc.,* 974 F.2d 712, 718 (6th Cir.1992). Case law development in this area indicates that where the conduct complained of involves a non-insider to the debtor, the "egregious conduct must be proven with particularity" and the creditor must be found guilty of "gross misconduct tantamount to fraud, over-reaching or spoilation to the detriment of others." *In re Baker & Getty Fin. Servs., Inc.,* 974 F.2d at 718. Ralph/McKinley did not introduce any credible evidence that SYB was an insider to KTTR, so the non-insider standard must apply.

■ *Ralph/McKinley* argue that SYB made imprudent loans to KTTR with actual knowledge of Ralph/McKinley's security interest, that SYB knew Ralph/McKinley relied on the $300,000 subordination provision, that the SYB loans caused KTTR to breach the Stock Purchase Agreement with Ralph/McKinley and that SYB's conduct was specifically directed to injure creditors or confer an unfair advantage on SYB.

The evidence introduced does not support a finding that any of SYB's conduct rose to the level of gross misconduct, over-reaching or spoilation to the detriment of others. Absent hindsight, Ralph/McKinley never proved that SYB made imprudent loans to KTTR. KTTR acquired substantial assets with the loans and used the working capital. There was no evidence introduced to show that over-lending caused KTTR or its creditors harm. The evidence was overwhelming that Mr. Ralph's departure and Mr. Fleig's position at the helm of KTTR were what most harmed KTTR.

Even though SYB knew of the terms of the Stock Purchase Agreement, it was not a party to the agreement and had no duty to Ralph/McKinley. Once SYB let Mr. Ralph off of his guarantees, their relationship vis a vis KTTR ended. Given the terms of the subordination provision in the Stock Purchase Agreement, the Court finds it was unreasonable for Ralph/McKinley to have relied on it to grant them a priority in KTTR's assets. This is particularly true since the payments to Ralph/McKinley on the large note were secured by KTTR's assets and involved payment for Ralph/McKinley's former equity position in KTTR, rather than debt. SYB's knowledge of the subordination is immaterial, given Ralph/McKinley's unreasonable reliance. Ralph/McKinley did not prove the KTTR/SYB Loans caused a breach of the Stock Purchase Agreement. If anything, SYB's loans provided capital and inventory for KTTR to provide cash flow for the Stock Purchase Agreement and the notes.

Finally, the record is silent on whether SYB's lending practice with KTTR was specifically directed toward the injury of KTTR, its creditors or Ralph/McKinley. The opposite is true, however, as the record demonstrates SYB loaned KTTR funds for business purposes which were evidently used for business purposes. Even during the June 2000 restructuring, SYB attempted an orderly restructuring of the large number of defaulted loans. These efforts all point toward a lender attempting to help a borrower get back on track, not damage the debtor or its creditors.

■ *Ralph/McKinley* next argue that KTTR became SYB's "alter ego" or instrumentality beginning in December 2000 and exercised dominion and control over KTTR

and used this domination to commit tortious or wrongful acts, causing unjust damage. While no exact test exists for application of this theory, the Sixth Circuit Court of Appeals has identified three facts that must exist in order for a court to ignore the corporate fiction. A plaintiff must show that the domination over the corporation by those to be held liable was so complete that the corporation had no separate mind, will or existence of its own, the domination and control was used to commit fraud or wrong or other dishonest or unjust act, and the injury or unjust event resulted in damage to the plaintiff. *Bucyrus–Erie Co. v. General Prods. Corp.*, 643 F.2d 413, 418 (6th Cir.1981).

■ Clearly, the evidence did not support a finding that SYB directly used KTTR as its instrumentality or used it as its "alter ego," nor did the evidence support a finding that SYB used KTTR indirectly through Ogden. Ogden did not act as SYB's agent, did not exercise dominion and control of KTTR and did not commit tortious or wrongful acts, causing unjust damage. Mr. Fleig was the one who used his position to commit tortious acts that clearly injured all of KTTR's creditors, including SYB.

■ Ralph/McKinley also argue that even if they do not prevail on their other theories, the Court should apply the doctrine of equitable marshaling.

> The doctrine of marshaling assets requires that where two or more creditors seek satisfaction out of the assets of their common debtor, and one of them can resort to two funds where another has recourse to only one of the funds, the former creditor may be required to seek satisfaction out of the funds which the latter creditor cannot reach, before resorting to the other fund.

*Bartley v. Pikeville National Bank & Trust Company*, 532 S.W.2d 446, 448 (Ky. 1975), citing to 53 Am.Jur.2d, *Marshaling Assets*, § 2. The only valuable property not encumbered by the Ralph/McKinley lien is the Fleigs' personal real estate and KTTR's vehicles.

■ As it happens, "the doctrine of marshaling the assets does not apply unless the litigants are creditors of the same debtor and both funds are in the hands of a common debtor of both creditors." *Bartley v. Pikeville National Bank & Trust Company*, 532 S.W.2d 446, 448 (Ky. 1975), citing 53 Am.Jur.2d, *Marshaling Assets*, § 9. While Ralph/McKinley acknowledge this basic principle, they suggest that Fleig and KTTR were one and the same. Ralph/McKinley did not submit evidence to support the position that Mr. Fleig was a "common debtor" with KTTR in order to support their claim. Even though Mr. Fleig committed wrongs against KTTR, there was no evidence that Mr. Fleig and KTTR were acting as one entity. Thus, there is no basis upon which to apply equitable marshaling.

■ The Court turns finally to Ralph/McKinley's claim that SYB committed tortious interference with KTTR's performance of the Stock Purchase Agreement. Kentucky law recognizes this cause of action and in order to maintain it, Ralph/McKinley must prove (1) the existence of a contract, (2) SYB's knowledge of the contract, (3) SYB intended to cause the breach, (4) SYB caused the breach the contract, (5) the breach resulted in damages, and (6) SYB had no privilege or justification to excuse its conduct. Kentucky law further provides that no action lies in Kentucky for such a breach unless the inter-meddler employs unlawful means, such as fraud, deceit, or coercion. *See Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 487 (Ky.1991). *See*

*also Stratmore v. Goodbody,* 866 F.2d 189, 194 (6th Cir.1989).

Specifically, Ralph/McKinley claim that the June 2000 restructuring and the November 2000 loans caused the breach of contract, *i.e.,* KTTR had outstanding loans in excess of the limitation in the subordination provision of the Stock Purchase Agreement. KTTR was in breach of the Stock Purchase Agreement within days if not at the time it was signed. *See* PX 27, Section 5 and Section 8. Further, the Court has found that the subordination provision relied upon by Ralph/McKinley did nothing more than provide that Ralph/McKinley would subordinate their lien, upon request. KTTR did default on payment under the Stock Purchase Agreement and the notes, but this was due to Mr. Fleig diverting KTTR's funds to the Republic Bank account, not SYB's lending practices or Ogden's efforts on KTTR's behalf. Finally, there is no credible evidence that SYB intended to cause KTTR's breach of contract with Ralph/McKinley.

The weight of the evidence points to Ralph/McKinley as insiders of KTTR. This evidence includes their understanding of all of the SYB transactions, participating in meetings involving KTTR's performance with SYB and frequent detailed reviews of financial information with KTTR's management. Indeed, while Ralph/McKinley refused to execute the Subordination and Standby Agreement SYB originally requested in June 2000 (but did not need to maintain its first lien), they did sign the Standby Agreement and received interest only payments through January 2001, showing that they still had considerable influence with KTTR. Taken as a whole, the record does not support a finding that SYB induced KTTR to breach the Stock Purchase Agreement, that SYB acted with malice or a lack of justification or the intent for KTTR to not perform its contract with Ralph/McKinley.

### CONCLUSION

For the foregoing reasons, the Court determines that Ralph/McKinley failed to sustain their burden of proof on the elements of their claims against SYB and therefore their claims are **DISMISSED, WITH PREJUDICE**.